MINER (UNITED STATES v.). See Case No. 15,780.

---

## Case No. 9,631.

### MINGE v. GILMOUR.

[Brunner, Col. Cas. 383;[1] 1 Car. Law Repos. 34.]

Circuit Court, D. North Carolina. June Term, 1798.

REAL PROPERTY — BARGAIN AND SALE DEED — WHAT PASSES BY — ESTATE TAIL — HOW BARRED — EX POST FACTO LAWS — CONSTITUTIONAL AND STATUTORY CONSTRUCTION — POWERS OF COURTS.

1. A deed of bargain and sale only passes such estate as the grantor has and can rightfully convey.

2. The issue in tail, with assets, are barred by their ancestor's deed of bargain and sale with warranty; and where other land descends liable to a charge, it is assets pro tanto.

3. An ex post facto law is one which punishes as a crime an act done before its passage, which, when committed, was not so punishable. The term does not apply to acts of a civil nature.

4. The judiciary, as a co-ordinate branch of the government, may declare a statute to be void if repugnant to the constitution; but where laws within the general scope of the authority of the legislature are passed, the courts cannot declare the same void because, in their opinion, they are contrary to principles of natural justice.

The jury found a special verdict, the substance of which is that John Minge, the grandfather of the lessor of the plaintiff, was seized in fee of the premises described in the declaration; that being so seized, he duly made his last will and testament on the 26th of November, in the year 1760; that the said John Minge departed this life in the year 1772, and his son David, the devisee, became seized of an estate tail on the said lands; that David, the son of John, being so seized and in possession of the said lands, executed a deed of bargain and sale on the 15th of February, 1779, to Charles Gilmour and William Hendric, containing the following clause of warranty: "And the said David Minge, for himself, his heirs and administrators, the aforesaid piece or parcel of land, with the appurtenances thereunto belonging, doth by these presents secure, and forever defend from the lawful claim or demand of any person or persons whatsoever, unto the said Gilmour and Hendric, their heirs and assigns; in testimony whereof, the said David Minge hath hereunto set his hand and seal the day and year above written"; that he afterwards, on the 15th of May, 1779, duly made his last will and testament, with a codicil annexed of the date of the 28th February, 1781, by which he devised land to John Minge which, at the time of his decease, was of greater value than the land conveyed to Gilmour and Hendric. They also find that the consideration money expressed in the deed had been paid. They pray the advice of the court, etc. The plaintiff claimed as heir in tail to David Minge.

Taylor & Badger, for plaintiff.
Davie & Baker, for defendant.

Before IREDELL, Circuit Justice, and SITGREAVES, District Judge.

IREDELL, Circuit Justice. I cannot refrain from expressing my high satisfaction in having heard this cause so ably and perspicuously argued on both sides; and which alone, in a case of so much novelty in some respects, and intricacy in others, could have enabled me to form an opinion so early. The title of the lessor of the plaintiff (independent of that of the defendant) is prima facie clear under a tenancy in tail; the father, who was tenant in tail in possession, having died, and he as his eldest son, as such entitled to enter. The defense is grounded on two points:— 1. A denial of the right of entry of the lessor of the plaintiff, which if well founded effectually destroys this remedy by ejectment; since, if the lessor of the plaintiff had no right to enter, he had no right to make the lease confessed by the common rule; and without such lease, either actual or confessed, the action cannot be maintained. 2. A denial of his title altogether, independent of the remedy now used for asserting it; which, if well founded, shows that the lessor of the plaintiff has no title upon which he could recover in any form of action.

To prove the first point, the defendant's counsel produce a deed of David Minge, the father of the lessor of the plaintiff, and who was the tenant in tail in possession, dated the 15th February, 1779, conveying the premises in fee with warranty to Charles Gilmour and William Hendric, under whom the defendant claims. This, it is alleged, bars the entry of the son, for these reasons: 1. Be-

---

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

cause such a deed, under the act of assembly of North Carolina passed in the year 1715, (chapter 38, § 6), is to be deemed equal to a feoffment in fee with livery, which it is admitted would create a discontinuance, and drive the issue to his formedon. [The section relied on in the act of assembly is as follows: "All deeds or conveyances of lands, tenements or hereditaments, goods or chattels, which are already passed and registered, or which shall be registered within one year after the ratification of this act, for which a good and valuable consideration has been actually and bona fide paid, shall be good and available in law and equity to the purchasers and their heirs and all others claiming by, for or under them, in as full and ample a manner to all intents and purposes as if such title had been made either by fine, common recovery, livery of seizin, attornment, or any other ways used and practiced within the kingdom of Great Britain."]2  2. Because, if this deed is not to be deemed a feoffment, it is at least a bargain and sale; and a bargain and sale, in fee with warranty, by the tenant in tail in possession, does, in itself, with or without assets, create a discontinuance, and consequently take away the entry of the issue. 3. Because an act of assembly passed in 1734 (which will be more particularly considered presently), if it does not bar the title, takes away all remedy by action or entry; and therefore whatever right may subsist in the lessor of the plaintiff, the courts are not permitted to give effect to it.

With respect to the first reason (that under the act of assembly of 1715 the deed ought to be deemed to have the same effect as a feoffment with livery and seizin). I do not think the act of assembly ought to have any such operation. If it had been necessary to convey the land at all, that a feoffment should have been made use of, the livery would have been dispensed with, together with any words of form that had been omitted, and public proof and registration be considered as a substitution of one kind, and a better kind of notoriety for another and a worse, because a feoffment at the present day, differently from the solemnities in former times, may be executed with livery in secret; though at the same time it is to be observed that even in that case, as our act requires all conveyances of land to be registered, such a feoffment must be registered; otherwise even an actual feoffment and livery itself would not be sufficient. In this respect, I conceive the law of this state differs from that of England. But when a conveyance has sufficient form to convey a rightful estate, it appears to me utterly unjustifiable to apply words in an act of the legislature which are calculated to give effect to a rightful conveyance imperfectly executed, in such a manner as to convert, by necessary construction, a rightful estate into a wrongful one; as in

2 [From 1 Car. Law Repos. 34.]

this instance, when the deed can operate as a bargain and sale (which is held to convey only what may lawfully pass), to say it shall operate as a feoffment, in order that it may work a discontinuance; for whatever legal effect a discontinuance may have, still it implies some wrong in the person who creates it. Thus, in strictness of law, and laying aside for the present all consideration of the indulgences granted to attempts to unfetter estates tail, it was the duty of the ancestor to preserve the right of possession for the heir, and not to deprive him of it by alienating that right to another, to his prejudice. We ought not, therefore, at any rate to say, in the present instance, when the ancestor's deed was sufficient to pass a rightful estate, that it shall be held to pass a wrongful one, unless upon the face of the deed there was clear evidence to show that the latter was his intention. But there is no such evidence in this case, for surely there is nothing on the face of this deed to warrant us in saying that the deed was designed as a deed of feoffment, and therefore that it shall operate (under this act) as a deed of feoffment would do, accompanied with actual livery.

The second reason (that this deed, operating as a bargain and sale in fee with warranty by tenant in tail in possession, does in itself, with or without assets, create a discontinuance), I am clear is well founded. The following authorities on the subject appear to me to be decisive (Litt. Ten. §§ 598–601; Co. Litt. 328; Gill. Ten. 112), placing a bargain and sale and a release on the same footing. And the reason, I conceive, why the warranty creates a discontinuance in the case of bargain and sale with warranty annexed, is this: It is a principle that when an estate to which a warranty is annexed is defeated, the warranty is good. Litt. Ten. 741. By the bargain and sale in this case, the bargainee had an estate called a base fee, determinable on the entry of the issue in tail. If there had been no warranty, the entry of the issue (speaking generally, and independent of the particular circumstances of this case) would have destroyed the estate altogether. If, therefore, notwithstanding the warranty, the entry of the issue was lawful, by his entry the estate to which the warranty was annexed would be defeated, and consequently the warranty itself destroyed. But in order to prevent this consequence, and to make the bargainee bar the issue if he can, by showing assets descended from the ancestor, the issue is not allowed to enter, and by that means ipso facto determine the estate, but he is driven to his formedon; in which case, the estate still subsisting until judgment is given against him, the warranty may be pleaded; and then the judgment will be given either for the demandant or tenant, as assets shall be made to appear or otherwise.

Being of opinion that for this reason the lessor of the plaintiff had no title to enter, it is unnecessary to say anything as to the

remaining reason alleged; and this, indeed, would be alone sufficient to entitle the defendants to our judgment. But as in every case, and especially one so important as the present, it is more desirable to decide on the intrinsic merits of a title than merely on the form of bringing it before the court, I shall proceed to investigate the real merits of the defendant's title independent of any form.

The title of the defendant is grounded upon the deed of the tenant in tail, David Minge, which I mentioned before, dated and executed the 15th of February, 1779, and conveying the premises in fee to Charles Gilmour and William Hendric, under which the defendant claims. This deed, as the defendant alleges, hath defeated the title of the lessor of the plaintiff, in one of two ways. Either—1. By the operation of the deed as a bargain and sale, with warranty and assets descending on the issue in tail, the present lessor of the plaintiff. Or, 2. By the act of the assembly of this state of April, 1784, c. 22.

With regard to the first, it is clear and is admitted that if assets to sufficient value have descended on the lessor of the plaintiff, he is barred; the reason of which is to prevent circuity of action, because the warranty binds him to fulfil the warranty of his ancestor, if he hath assets to that purpose; and if he recovered in this action he would be immediately possessed of assets, and of course liable to an action in respect of them. But it is objected that in this instance the heir is not liable in respect of assets,—1. Because the land descended liable to a charge. 2. Because the heir did not take in quality of heir, but as devisee. As to the first reason, the law seems to be that notwithstanding a charge, if it doth not exhaust the whole assets, the heir shall be liable in respect to the overplus, which he undoubtedly takes as heir. Though the law appears formerly to have been held otherwise, yet probably that was owing to the uncertainty in many cases of ascertaining whether a charge would exhaust the whole assets or not, and a particular decision unwarily crept into a general principle. Later decisions seem to have placed this on a proper footing by declaring that where the charge is plainly less than the value of the whole land, the overplus shall be assets. The assets in the present instance are expressly found to be sufficient beyond the charges to which the estate is liable; and therefore this objection is of no avail. But I have serious doubts whether, at the time of the death of the ancestor (which is the true time for considering the liability of the heir), he did not take as devisee, and not as heir; in which case he seems not to be liable; though, possibly, if they have in Virginia a statute like that in England concerning fraudulent devisees, he might, even under those circumstances, be deemed liable. I know not how the fact as to the Virginia law is; and therefore, as well as because the infer-

ence is altogether a new suggestion, which would demand much consideration before it ought to be established, I consider this point of the case, it being uncertain whether he takes as heir or devisee, too doubtful to ground an opinion upon it.

I therefore proceed to the next inquiry—whether he is barred by the act of assembly? I admit, as strongly as any man can assert, that if this act of assembly is plainly unwarranted by the constitution, it is totally void as being passed without authority, the authority of the legislature being, in certain cases, restricted by a superior power which must of course be obeyed. The constitution is a law of the land, as well as an act of assembly, with this difference: that the former is a supreme law, paramount to all acts of assembly, and unrepealable by any. As in case there is a dispute whether one act of assembly is in force or another, the judges must decide this, and when the latter law is inconsistent with a former, say the latter is in force, because it has repealed the former, having authority to repeal it. So when the constitution says one thing and an act of assembly another, the judges must say the former law is in force and not the latter, because the former is a supreme law unrepealable and uncontrolable by the authority which enacted the latter.

The act in question has been contended to be unconstitutional, because it has been suggested that it is in violation of the following parts of the constitution of this state: The twelfth, fourteenth, and twenty-fourth sections of the bill of rights, which is declared to be a part of the constitution.

The twelfth section is as follows: "That no freeman ought to be taken, imprisoned, or disseized of his freehold liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the law of the land." This I believe is taken from Magna Charta, and simply means, as I understand it, that there shall be no violation of the laws of the land. This provision, in the barbarous and ignorant times in which Magna Charta was enacted, might be proper to restrain the excesses of arbitrary and unprincipled kings and nobles, who were every day trampling on the law; more especially as, even in more settled times, a dispensing power was alleged by many to be a part of the prerogative of the crown. In the present era of improved knowledge of law and liberty, it seems scarcely to have been necessary, though no principle is of higher importance; because no one would have the effrontery to contend that he had a right to violate the law. It is a part of the constitution, however, that must be sacredly observed; and I trust it is a principle that would have been equally respected if it had formed no part of it. If the law of the land does not in this case authorize judgment to be given for the defendant, in the opinion of this court, it will undoubtedly not be given.

The fourteenth section is in the following words: "That in all controversies at law respecting property the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable." The expression here is rather indefinite, but at the utmost it can only mean that in all cases where trial by jury formerly took place such should be the mode of trial in future. To apply that to this case: In ejectments formerly, on the issue of not guilty, the trial was by jury; so it has been in this instance. The constitution, therefore, in this particular has been exactly observed.

The following are the words of the twenty-fourth section: "That retrospective laws punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty. Wherefore no ex post facto law ought to be made." This, from the construction of the whole clause, evidently relates to punishment by subsequent acts for things innocently done at the time, or then punishable in a different manner. The clause considers the words "ex post facto," as I conceive, to have that meaning; otherwise the conclusion is too large for the premises. In a great case now depending in the supreme court of the United States, argued last February, on the meaning of ex post facto laws, in the sense of the constitution of the United States, numerous and strong authorities were adduced to show that the expression "ex post facto" technically had that meaning. A majority of the judges appeared to be convinced of it, but upon the doubt of one the case was not decided. There are strong reasons why the expression should be confined to criminal and not to civil cases. No principle can ever justify the punishment of an innocent man; and a man is certainly innocent who violates no law in being. Neither can it ever be justified to punish a man not entirely innocent, in a different manner from the punishment prescribed and pointed out to him at the time his offense is committed. These are first principles of natural justice, a deviation from which will generally be found as impolitic as it is unjust. But in times of violent faction or confusion of any kind, men are often prompted, if they can, to destroy their adversaries under the color of the law. The numerous acts of attainder in England, and other arbitrary parliamentary punishments, show how necessary it was for a wise people, forming a constitution for themselves, to guard against tyrannies like these; but there not only is little reason to apprehend a legislative interference for the sake of unjustly transferring property from one man to another, but a constitutional provision to that effect would be found extremely difficult without interfering with some of the most necessary principles of legislation. A few instances will be sufficient to show this: 1. As to the roads. It is absolutely necessary in every country that there should be a power of laying out public roads. This of course must be done under the direction of the legislature. Suppose, in the opinion of the legislature, a particular road ought to be laid out; but one or two individuals who own land through which it must pass will not consent to part with any of it for that purpose. Are the public to suffer for want of such a road, or may not the legislature order the land they have occasion to make use of to be valued, and appropriate it accordingly, after paying or tendering the value? 2. In the case of fortifications. The erection of such in particular places might be indispensable for the safety of the country in defending it against a foreign enemy. Ought the possibility of such defense to be liable to be defeated by the caprice or disaffection of a single individual, or the legislature to cause the fortifications to be erected, taking the proper care to compensate the individual to the full value of the property and for any consequential injury arising from the loss of it? 3. So also in the case of light-houses. It is certainly the duty of every country, not only for the safety of its own citizens, but from motives of general humanity to all others, to erect light-houses on such parts of the coast where dangers to navigation may be imminent without such assistance. How defective would be that policy which should deprive a legislature of so useful a power, to the loss, possibly, of many innocent lives! 4. So also when it is deemed necessary to impose taxes. Is anything more common than to direct a distress upon the property of an individual, if his taxes are not paid, and if unpaid within a limited time, that the property either real or personal, as the case may be, shall be sold in order to raise the money? These are obvious instances, to which others might easily be added to show that a legislature would be deprived of some of its most essential and important powers, if its authority was so restricted that it could not take away property from individuals, in any instance, without the owners' personal consent, directly given for that purpose, even for objects of the utmost public concern, and after the greatest care to prevent any injury to the individual. It would therefore have been very unwise if the constitution had restricted the legislature in any such instance; and this consideration, combined with the little probability of such a power being abused, is a strong additional reason why the words "ex post facto" should be confined to criminal cases only, especially when there not only are no words that require a contrary construction, but the words themselves plainly point out the construction I have given.

It is, however, further urged by the counsel for the plaintiff that this act is contrary to natural justice, and therefore void. Some respectable authorities do, indeed, countenance such a doctrine—that an act against

natural justice is void. Others maintain a different one, with at least an equal claim to respect. Under these circumstances, I can only consult my own reason; and I confess I think no court is authorized to say that an act is absolutely void merely because, in the opinion of the court, it is contrary to natural justice.

Two principles appear to me to be clear: If an act be unconstitutional, it is void. If it be constitutional, it is valid. In the latter case it must be admitted that the legislature have exercised a trust confided to them by the people. In doing so they necessarily are left to their own discretion, and it is to be presumed they will have a due regard to justice in all their conduct. It is, however, I conceive, left to them so far without control; and if they abuse their trust in the execution of an acknowledged power, they are indeed responsible, in the only way in which a legislature can be responsible, for not exercising their authority properly; but still, having exercised an authority confided to them, their act is legal in the same manner as a judgment given by this court would be, in a case confessedly within its jurisdiction, however erroneous the principles may be on which the court decided. The words "against natural justice" are very loose terms, upon which very wise and upright members of the legislature and judges might differ in opinion. If they did, whose opinion is properly to be regarded—those to whom the authority of passing such an act is given, or a court to whom no authority, in this respect, necessarily results? This case is surely different from an unconstitutional act which the courts must certainly declare to be void, because passed without any authority whatever. The constitution, by saying that the legislature shall have authority in certain cases, but shall not have in others, as plainly declares everything valid done in pursuance of the first provision, as everything void that is done in contradiction of the last; and it may surely be inferred that if, in addition to other restrictions on the legislative power, such a restriction as that in question was intended, so as to leave it to the courts, in all instances, to say whether an act was agreeable to natural justice or not, this restriction would have been inserted, together with others. All courts, indeed, as being bound to give the most reasonable construction to acts of the legislature, will, in construing an act, do it as consistently with their notions of natural justice (if there appears any incompatibility) as the words and context will admit; it being most probable that, by such construction, the true design of the legislature will be pursued; but, if the words are too plain to admit of more than one construction, and the provisions be not inconsistent with any articles of the constitution, I am of opinion, for the reason I have given, that no court has authority to say the act is void because in their opinion it is not agreeable to the principles of natural justice.

Admitting, however, that this is a ground upon which a court has authority to decide, I am of opinion that this act is not contrary to the principles of natural justice. We are to recollect that, for many centuries in England the establishment of perpetuities in landed estates has been deemed a great grievance. An estate tail, in particular, created by the statute de donis (which is undoubtedly a perpetuity, because by possibility it may last forever), has been considered a dangerous support of a high aristocratic interest attended with numerous evils both public and private, so much so that though the statute has never been directly repealed, yet successful evasions of it have been practiced, and some of them with the direct sanction of the legislature itself. If this act, therefore, has been in such discredit even in England, where there exists a government consisting of king, lords, and commons, of course a great aristocratical interest, notwithstanding which it has been deemed too aristocratical even for them, well might it excite the jealousy and precaution of the representatives of the people of this state, assembled to establish a republican form of government, founded on the basis of political equality among all the citizens, and to which any aristocratical devices must be particularly detrimental. This subject, therefore, did not escape the attention of the convention who framed the constitution of this state; but they made the following provisions concerning it: 1. In the bill of rights (section 23): "That perpetuities and monopolies are contrary to the genius of a free state, and ought not to be allowed." In the constitution (section 43): "That the future legislature of this state shall regulate entails in such a manner as to prevent perpetuities." It may well be conceived that in the very critical period in which this convention sat, and considering the other important business they had to do, they had not sufficient leisure to attend to this subject, so as to make a provision for it in all its proper details. They therefore directed a future legislature to do it; but, by the anxiety they showed on the subject (declaring perpetuities and monopolies contrary to the genius of a free state, and directing the legislature in the manner above expressed), they showed their opinion of the existence of the evil, their earnest desire to remedy it, and that it was of a kind which in their opinion required the sanction of the constitution itself, and might not safely be confided altogether to legislative discretion to provide a remedy or not. It may therefore justly be considered that the legislature had the authority of the convention as to this object devolved on them, and consequently, that when the law passed which they were directed to enact, it should have the same effect as if the provisions in it had formed part of the constitution itself. The provision in the constitution would otherwise be nugatory and idle, since, had that said nothing on the subject, the legislature

might undoubtedly have regulated entails as they pleased.

It is a known principle of law, in any ordinary case, that when any estate is created by virtue of a power, the party to whom it is conveyed shall be deemed to hold the estate under the power, and not simply under the conveyance itself. We know it is an invariable principle of equity (whose object it professedly is to decide on the principles of natural justice, when no express law interferes), that what ought to have been done shall be regarded as done. As estates of this nature are declared by the bill of rights to be contrary to the genius of a free people, and that they ought not to be allowed, and the legislature are directed by the constitution to regulate entails in such a manner as to prevent perpetuities, if either the difficulty of the case, the interference of other business, or the wilful neglect of the legislature occasioned a postponement of the remedy which it was the duty of the legislature to provide, it cannot be unreasonable to say, that when the provision was made, it should guard against any intermediate evils (if any had occurred), which had accrued contrary to the true intent and meaning of the constitution, in which the whole people had an interest, and the benefits of which they were entitled to, without the legislature being at liberty to withhold them. Upon a great scale the legislature may be considered as trustees, the people as the persons for whose benefit the trust was created. Ought they, therefore, to suffer any injury by any delay in the execution of the trust? They certainly ought not, if it were in the power of the trustees to prevent it. In this case, I conceive, the legislature, at the time they executed this authority, were to consider whether the evils which had happened in the mean time (if any had happened) required a retrospective remedy in order to defeat any mischief which a delay contrary to the intent of the constitution had occasioned or not. If it appeared to them that such a remedy was proper, to give the constitution its full effect, I conceive they not only had authority, but it was their duty to provide it; the whole regulation on this subject being by the constitution itself left to their discretion. If no such remedy appeared necessary they might make an ordinary act, to take place in every particular in future; but they viewed it in the former light, and their decision, of course, must be submitted to. The persons to be affected by this act who resided in the state, and were citizens of it, might derive more benefit from their share of the public property occasioned by the remedy against so great an evil, than loss by being deprived of a particular estate derived from so obnoxious a source. They, at any rate, partake equally of the benefits of the constitution with others who were parties to it, and consequently liable to all its advantages and disadvantages. Persons who are not resident in the state, but as citizens of other states are permitted to hold lands in it, though in some respects differently circumstanced, cannot expect to hold their titles upon a different footing from citizens themselves, and may possibly, in some particular instances, be compensated for the loss of one estate by the superior value of others, if they hold such, derived from the general influence of wise precautions for the public benefit. In a state of society properly regulated it must frequently happen that private and publis interests in some degree interfere with each other. In such cases is it not unavoidable, and agreeable to the very principle on which all governments are formed, that the former should yield to the latter? Yet, clear as this principle is, and necessary as in many cases it is that it should be enforced, many, from injudicious notions of liberty, speak of the rights of each individual as if he subsisted in a state of nature unconnected with any other mortal in the universe, and deriving no benefits from a well-constituted society, which are more than an ample compensation for any accidental sacrifice which the public interest may occasionally require of a subordinate private advantage to a superior public good. These are considerations upon the supposition that the rights of the lessor of the plaintiff subsisted in full force under the statute de donis until the act of assembly in question was made. That, however, may well be doubted because there seem at least plausible reasons for suggesting that it was altogether taken away by the constitution, or at least by the act of assembly of April, 1778, c. 5. It will be immaterial to consider the effect of the former, because, if the latter was not operative enough for the purpose, the former undoubtedly was not; and if the latter was, it was sufficiently early to establish the title of the defendant on this ground.

The provisions of the act in question, so far as they concern this subject, are as follows: "Whereas doubts may arise upon the revolution in government, whether any and what laws continue in force here: For prevention of which, be it enacted," etc., "that all such statutes and such parts of the common law as were heretofore in force and use within this territory, and all the acts of the late general assemblies thereof, or so much of the said statutes, common law, and acts of assembly as are not destructive to, repugnant to, or inconsistent with the freedom and independence of this state, and of the government therein established, and which have not been otherwise provided for in the whole or in part, not abrogated, repealed, expired, or become obsolete, are hereby declared to be in full force within this state." Though these words are altogether in the affirmative, they imply a negative because the act was expressly made to remove doubts "whether any and what laws" were in force, and of course to exclude from the construction of being in force all not specified. If, therefore, the statute de donis be not one of those intended by

the legislature to be in force, it remained no longer in force after this act was made, even had it been so till then. Whatever doubt might have existed otherwise, yet the words of the bill of rights and the constitution themselves show that, in the opinion of those who framed them, this act was deemed inconsistent with the freedom and independence of this state. This act, therefore, was not one of those declared to be in force, and consequently, if no exception is to be made of this case in particular, it is to be deemed abrogated, at least from that time. There being special provision in the constitution concerning entails, any act on this subject might be deemed impliedly excepted from these general words if such estates then in being were to be entirely destroyed by it; but if they were not, the only effect such a construction could have would be to reduce them to their common law condition, that is, to make them fees conditional, by taking off the restraint of alienation which the statute de donis imposed, and which restraint constituted the whole danger from them which the constitution contemplated. If this view of the subject be proper, then, as this act was passed in April, 1778, when David Minge was alive, instead of holding an estate tail, as before, he held an estate called a fee conditional one, the property of which undoubtedly was, as he had then issue born capable of inheriting the estate, to alien the estate as he thought proper. His alienation, accordingly, to Gilmour and Hendric, under the deed of the 15th February, 1779, is (upon this ground) a complete bar to the lessor of the plaintiff, independent of all other circumstances in the case. I do not, however, confidently rely upon this principle; but whatever doubt may be entertained on that part of the case, I am clear in the former reasons I have urged, showing that the title of the lessor of the plaintiff (if he ever had any) was constitutionally taken away by the conjoint operation of the constitution and the act of assembly passed in pursuance of its express authority; and therefore that he must fail in this case as well for want of title as from pursuing an improper remedy.

I am althorized to say my Brother SITGREAVES [District Judge] concurs in this opinion; the consequence is that there must be judgment for the defendant.